Angie GEARY

v.

Al GOLDSTEIN, et al.

Civ. A. No. 90–0460–P.

United States District Court,
D. Rhode Island.

Jan. 13, 1992.

John J. Barton, Taylor, Anderson & Travers, Boston, Mass., for plaintiff.

Kenneth P. Norwick, Norwick & Schad, New York City, Lynette Labinger, Roney & Labinger, Providence, R.I., for defendants.

MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Defendants in the above-captioned case have petitioned this Court for dismissal of Plaintiff's Complaint. Defendants' motion is predicated on Federal Rule of Civil Procedure 12(b)(2), which provides for dismissal of an action if the court lacks personal ("in personam") jurisdiction over the defendant(s). I find that in personam jurisdiction is lacking, and I order immediate transferral of this action to the Southern District of New York, pursuant to 28 U.S.C. § 1631.

I.

Plaintiff Angie Geary, a Rhode Island resident, is a fashion model associated with

a major New York modeling agency. In July 1988, Ms. Geary contracted to appear in a television commercial advertising a product known as "Wasa Bread." This commercial was aired nationally on network television.

The Defendants, Mr. Al Goldstein, Midnight Blue, Inc., and Milky Way Productions, Inc., are New York residents. Plaintiff describes defendants' business as "creating, publishing, producing, broadcasting, presenting, marketing and distributing 'adult entertainment' in various forms, including magazines, newspapers, videos, films, television programs, sex products, and 'phone sex' services." Plaintiff's Complaint at 3. In less diplomatic terms, the defendants produce and sell pornography.

Plaintiff alleges that, "on or about October of 1989, the defendants created, produced, broadcast, presented, marketed or distributed, as part of the Midnight Blue television program [a pornographic cable television show produced by at least one of the defendants], a segment or commercial of their own which featured portions of the original Wasa Bread commercial juxtaposed with pornographic material showing men and women in various forms of sexual activity." Pltf's. Complaint at 3. Defendants do not contest this allegation; nor do they contest that this segment of "Midnight Blue" was broadcast to Manhattan cable television viewers. It is also undisputed that Ms. Geary's consent was not obtained by the defendants prior to their "adaptation" and subsequent use of the commercial in which she was featured.

Plaintiff alleges that she has suffered pecuniary loss as a result of defendants' actions. The Wasa Bread commercial was pulled from the air after portions of it appeared on "Midnight Blue;" Ms. Geary lost residuals and royalties which would otherwise have been forthcoming if the commercial had continued to enjoy television air time. Plaintiff bases the present action on the torts of defamation and invasion of privacy, claiming that the defendants' action has subjected her to "contempt, ridicule, indignity and embarrassment, has caused her to suffer damage to

her personal and professional reputations, and has resulted in a loss of income to her and a diminution of her future earning capacity." Pltf's. Complaint at 5.

## II.

This Court has previously set out the legal standard for in personam jurisdiction as follows:

In a diversity action, the law of the forum governs the question whether the defendant is properly subject to the jurisdiction of this Court. *Hahn v. Vermont Law School*, 698 F.2d 48, 49 (1st Cir. 1983). Because the Rhode Island long-arm statute permits jurisdiction to the fullest extent permitted by the federal constitution, R.I.G.L. § 9–5–33; *see Roger Williams General Hospital v. Fall River Trust Co.*, 423 A.2d 1384 (R.I. 1981), the inquiry turns on whether the defendant has sufficient minimum contacts with the forum state to ensure that compelling them to defend a lawsuit here "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In making this determination, "a court properly focuses on 'the relationship among the defendant, the forum and the litigation'" *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (citations omitted) and considers whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court" in the forum. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

*Demirs v. Plexicraft, Inc.*, 754 F.Supp. 250, 251–52 (D.R.I.1990).

■ There are two distinct types of in personam jurisdiction in the federal courts: specific and general. Specific jurisdiction exists when the plaintiff's cause of action arises out of the defendant's contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). Conversely, general jurisdic-

tion exists when the plaintiff's cause of action is *unrelated* to the defendant's in-state activities. *Id.* at n. 9. The applicable legal standard differs depending on whether one is talking about specific or general jurisdiction. "Although minimum contacts suffice in and of themselves for specific jurisdiction ... the standard for general jurisdiction is considerably more stringent." *Dynamic Concepts v. Modern Chain Mfg. Co., Inc.*, 610 F.Supp. 285, 287 (D.R.I.1985) (citations omitted).

Whether specific or general jurisdiction is asserted by the plaintiff, she has the burden of presenting facts sufficient to support her contention that this Court has jurisdiction over the instant action. *Dynamic Concepts*, 610 F.Supp. at 286 n. 1 (*citing American Freedom Train Found. v. Spurney*, 747 F.2d 1069, 1075 (1st Cir. 1984)). However, in reaching today's decision, this Court has accepted as true the allegations presented in plaintiff's Complaint.[1] *See Thompson Trading Ltd. v. Allied Lyons PLC*, 123 F.R.D. 417, 421 (D.R.I.1989), *recons. den.*, 124 F.R.D. 534 (D.R.I.1989) (citations omitted) ("The general rule, clearly accepted in the First Circuit, is that when a court makes a ruling on a motion to dismiss, it must accept the allegations of the complaint as true."). Since plaintiff rests her jurisdictional argument on both specific and general in personam jurisdiction, the Court will address each of these jurisdictional claims individually.

## A. SPECIFIC JURISDICTION

■ In order for this Court to have specific jurisdiction over the instant action, the torts allegedly committed must have occurred within Rhode Island. Plaintiff's Complaint is based on the defendants' production and dissemination of a pornographic parody of a commercial in which she starred. Only if the parody had been aired in Rhode Island could the torts of defamation and invasion of privacy have been committed in this State.[2]

At first blush, there appears to be a factual controversy as to whether the Wasa Bread parody was viewed by anyone in Rhode Island. While plaintiff has been unable to produce proof that the segment was aired within this state, or that any Rhode Island resident has viewed it at home or elsewhere, she argues that the Court should infer that the Wasa Bread segment of "Midnight Blue" was aired in Rhode Island. Plaintiff justifies this inference by stating:

> The fact that the defendants have refused to produce a complete set of the requested videotapes and broadcast logs, when considered in light of the shared content of the "Midnight Blue" cablecasts and satellite broadcasts, supports *more than* a "reasonable inference" that the pornographic Wasa Bread piece, which is the focus of this lawsuit, was in fact also broadcast by satellite to Rhode Island.

Plaintiff's Opposition Memorandum at 7 (emphasis in original).

Defendants, in turn, contend that "*None* of the seventeen satellite transmissions of *Midnight Blue* included the Wasa Bread parody." Defs'. Reply Memo. at 8 (emphasis in original). Defendants have offered a variety of depositions, affidavits, broadcast logs, and videotapes to support their position.[3] Defs'. Reply Memo. at 8–11. *See also id.* at 24–27. These materials clearly refute plaintiff's claim that defendants

---

1. The only exception to this general policy arose where defendants' affidavits and other documentation overwhelmingly disproved plaintiff's allegations.

2. The Court agrees with defendants' analysis on this point. "All of plaintiff's claims are based on the Wasa Bread parody. Accordingly, the Court can only predicate *specific* personal jurisdiction over any of the defendants on a finding that the allegedly tortious conduct occurred— *i.e.*, that the parody was seen—in Rhode Island." Defendants' Reply Memorandum at 24.

3. Defendants have now provided five sworn affidavits, sworn deposition testimony, and two document responses signed by their attorneys, stating simply, categorically, and unequivocally that the parody was shown nowhere but in the borough of Manhattan. They have produced broadcast logs of *all* satellite transmissions. Plaintiff herself has produced a videotape reflecting two additional transmissions, which independently corroborates the accuracy of the broadcast logs. Defs'. Reply Memo. at 25.

have failed to offer proof of the content of the satellite broadcasts of "Midnight Blue."

This Court finds that any factual dispute as to whether the Wasa Bread parody was aired by satellite in Rhode Island is based on little more than plaintiff's wishful thinking. The "inference" suggested by plaintiff is attenuated to say the least, and must be rejected in light of the information now before the Court. Both plaintiff and defendants have submitted voluminous documentation to the Court, and based on a review of these records, the Court is satisfied that the parody was never aired within Rhode Island.[4] No more need be said regarding specific jurisdiction; in this venue, it simply does not exist.

## B. GENERAL JURISDICTION

■ Although the parties' dispute is unrelated to Rhode Island, there is a second type of in personam jurisdiction that could preserve plaintiff's action in this forum. For *general* in personam jurisdiction, it is not essential that the plaintiff's cause of action be related to the forum. *See Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), *reh'g denied,* 343 U.S. 917, 72 S.Ct. 645, 96 L.Ed. 1332 (1952). *Accord, Eastland Bank v. Massbank for Savings,* 749 F.Supp. 433, 436 (D.R.I.1990). The First Circuit recently described the requisites of general jurisdiction in the following manner: "The outcome of a search for general jurisdiction depends largely on whether a corporate party carried on 'continuous and systematic' activities within the forum sufficient to justify requiring it to answer there to a claim unrelated to its in-forum

presence." *Sandstrom v. Chemlawn Corp.,* 904 F.2d 83, 88 (1st Cir.1990).

■ In order to determine whether defendants' contacts with Rhode Island suffice to subject defendants to general jurisdiction in this forum, the Court must look to similar cases in the Circuit. A review of recent caselaw on the subject indicates that defendants' contacts do not reach the threshold required for general jurisdiction. In *Petro. Serv. Holdings v. Mobil Exploration & Prod.,* 680 F.Supp. 492 (D.R.I.1988), the Court held that the fact that the defendant maintained a "support office" within the forum for approximately twelve months (which office closed several months before the cause of action arose), and the fact that the defendant was named as a party defendant in a Rhode Island lawsuit, did not give rise to general jurisdiction over said defendant.

The Court in *Russo v. Sea World of Florida, Inc.,* 709 F.Supp. 39 (D.R.I.1989), held that nationwide advertising by defendant, combined with defendant's sale of discount tickets to Rhode Island travel agents, constituted an insufficient basis for assertion of general jurisdiction over the defendant. Plaintiff Russo had argued that general jurisdiction was appropriate, given that 1.2% of defendant's gross revenues came from within Rhode Island. The Court disagreed, stating "[s]uch a fact standing alone ... is irrelevant to a discussion of forum contacts for it is contact with the state, and not its residents, that is pertinent." *Id.* at 42, *citing Helicopteros,* 466 U.S. at 417, 104 S.Ct. at 1873.

---

4. The Court wishes to draw attention in particular to Exhibit A, attached to the December 9, 1991 Reply Affidavit of Leonard Eisenberg. Exhibit A consists of broadcast logs for each of the seventeen satellite transmissions of "Midnight Blue." Nowhere on any of these broadcast logs is there an entry indicating that the Wasa Bread parody was included in any satellite broadcast. (It should be noted that there *were* entries for other commercial satires within these broadcast logs. The log for satellite transmission #17, for example, contains an entry for "Commercial Satire—Jordache Jeans.")

In addition to the above-referenced documentation—provided by the defendants—the Court

must acknowledge that plaintiff has had more than a year in which to conduct discovery with respect to the motion to dismiss. That motion was filed on October 31, 1990; a series of motions and stipulations essentially to extend discovery resulted in over twelve months' delay, finally ending when plaintiff filed her objection to the motion to dismiss on November 12, 1991. In over a year's time, plaintiff has apparently been unable to find *any* evidence to disprove defendants' contention that the Wasa Bread parody did not appear in even a single satellite broadcast.

In *Wood v. Angel,* 707 F.Supp. 81, 84 (D.R.I.1989), the Court held that "[i]solated trips to Rhode Island to accompany a relative, or to consult an attorney, defend a suit, and visit one's child simply do not constitute 'continuous and systematic' contacts with this forum." Finally, in *Donatelli v. National Hockey League,* 893 F.2d 459, 471 (1st Cir.1990), the First Circuit held that National Hockey League telecasts into Rhode Island "form too slippery a foothold for personal jurisdiction over the NHL" where the cause of action did not arise out of these telecasts.

Plaintiff in the case at bar enumerates several factors which she believes support a finding that the defendants carry on continuous and systematic activities within Rhode Island and are thus subject to this Court's general jurisdiction.[5] Specifically, plaintiff points to the following alleged contacts between the defendants and Rhode Island:

1. Defendants' solicitation of customers in Rhode Island via satellite.[6]

2. Defendants' telephone sex services.[7]

3. *Screw* Magazine sales in Rhode Island.[8]

4. Defendants' income from ads placed by Rhode Islanders in *Screw* Magazine.[9]

5. Defendants' solicitation of customers in Rhode Island via *Screw* Magazine.[10]

6. Defendants' telephone contacts with Rhode Island.[11]

---

5. It is clear from reading Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss that plaintiff has "pooled" the contacts of the three defendants in arguing that general jurisdiction exists over each defendant. On page 15 of her Memo, she states categorically, "the defendants should be treated as one for jurisdictional purposes." Basically, she argues that the two corporate defendants are wholly controlled by defendant Al Goldstein, and thus the corporate veil of the two corporate defendants should be pierced.

"Pooling" contacts of multiple defendants (i.e., examining the forum contacts of the various defendants *as a group* to determine whether each defendant's contacts, when considered *in conjunction with* the contacts of the other defendants, meet the general jurisdiction requirement) is neither unprecedented nor impermissible under appropriate circumstances. "There is a presumption of corporate separateness that [may] be overcome by clear evidence." *Donatelli,* 893 F.2d at 465 (1st Cir.1990), *quoting Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 905 (1st Cir.1980). If, as plaintiff alleges, the two corporate defendants are merely conduits for defendant Al Goldstein, the three defendants' contacts should be pooled to determine whether Mr. Goldstein, by virtue of his continuous and systematic activities in the state of Rhode Island, is subject to general jurisdiction in this District. Pltf's. Opp. Memo. at 15–20.

For the purpose of ruling on defendants' motion to dismiss, I have adopted plaintiff's approach of pooling the defendants' contacts with this forum. Finding as I do that the defendants' pooled contacts do not reach the minimum threshold for general jurisdiction, I can assume that no one defendant's contacts are sufficient to allow me to exercise general jurisdiction with respect to that defendant.

6. "[T]he satellite broadcasts [of "Midnight Blue"] to Rhode Island were replete with advertisements for: Screw Magazine subscriptions; 'USA–SCREW,' a telephone sex line in which the defendants had a financial interest; and 'GRAB BAG,' a line of sex toys being marketed by the defendants under the Media Ranch, name." Pltf's. Opp.Memo. at 8.

7. "[D]efendants derived substantial income from this pornographic enterprise, a portion of which would be attributable to Rhode Island customers." Pltf's. Opp.Memo. at 10.

8. "[T]he defendants derive income from their sale of Screw Magazine to those distributors who in turn market Screw Magazine in Rhode Island.... [A]pproximately 188 Screw Magazines are sold by [the distributor] in Rhode Island each month." Pltf's. Opp.Memo. at 10–11.

9. "[A]t least eight Carnal Classifieds [were] placed by Rhode Island readers [in *Screw* Magazine] from October of 1988 to April of 1990." Pltf's. Opp.Memo. at 12.

10. Screw Magazine is replete with Screw Magazine subscription forms and advertisements for the defendants' other products and services. Among the most prevalent are ads for the "Midnight Blue" program, both satellite and cable broadcasts, and ads for the telephone sex services which are marketed using Al Goldstein's name and endorsement and the Screw Magazine logo. Pltf's. Opp.Memo. at 12.

11. Plaintiff alleges that, between 1989 and 1990, defendants placed 41 phone calls into Rhode Island.

Defendants, on the other hand, contend that this Court may not exercise general jurisdiction over them, since none of them has

> ever (i) resided in Rhode Island, (ii) maintained an office there, (iii) been licensed or otherwise authorized to do business in the State, (iv) maintained employees, agents, bank accounts or telephone numbers in Rhode Island, (v) registered a motor vehicle there, or (vi) entered into any business ventures with anyone in Rhode Island.

Defs'. Reply Memo. at 12.

United States Supreme Court and First Circuit precedent constrain this Court to find that general in personam jurisdiction is lacking as to all three defendants.[12] Close scrutiny of defendants' contacts (as alleged by plaintiff) clearly indicates that these contacts cannot be equated with defendants' "continuous and systematic" activities within Rhode Island. The telephone calls placed from defendants' phones and the ads placed in *Screw* Magazine by Rhode Islanders are simply too infrequent to be meaningful for jurisdictional purposes.

The other contacts discussed by plaintiff do not constitute contacts with Rhode Island per se. The fact that a periodical (a term this Court can use only in the most loose sense to describe "Screw" Magazine) or a television program contains advertisements for products and services related to its theme does not render the producer of that periodical or T.V. show subject to general jurisdiction anywhere the ads are read or viewed.

Nor can this Court accede to plaintiff's request that I assume some number of the callers to a telephone service operated by defendants are from Rhode Island. Even were I to accept this "fact," it would not provide a basis for asserting general jurisdiction over these defendants. Pltf's. Opp. Memo. at 10. Finally, the sale of *Screw* Magazine in Rhode Island by independent distributors (as opposed to direct distribution in this State by defendants themselves) can not suffice to subject defendants to this Court's jurisdiction.

### III.

I find this Court may exercise neither specific nor general in personam jurisdiction over these defendants. However, rather than dismissing Plaintiff's Complaint, I hereby order that the action be transferred to the Southern District of New York.[13]

SO ORDERED.

---

**12.** Plaintiff's reliance on *Curtis Pub. Co. v. Golino*, 383 F.2d 586 (5th Cir.1967), *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), and *David v. National Lampoon, Inc.*, 432 F.Supp. 1097 (D.S.C.1977) is misguided. These three cases discuss specific jurisdiction, and therefore cannot be analogized to the instant case to support a finding of general jurisdiction.

**13.** This Court's authority to transfer an action to another district derives from 28 U.S.C. § 1631, which states:

> Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action ... to any other such court in which the action ...

could have been brought at the time it was filed or noticed, and the action ... shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred. *See also Resolution Trust Corp. v. Westgate Partners, Ltd.*, 937 F.2d 526, 532 n. 9 (10th Cir.1991). The interest of justice clearly favors a change of venue in the instant action. Since all three defendants are New York residents, and the plaintiff's cause of action arose in Manhattan (the Wasa Bread satire was aired on "Midnight Blue" in Manhattan), the Southern District of New York clearly *does* have jurisdiction over this case.